In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2206

SUSAN I. MOULTRIE, as Executor of the
Estate of LEVIA MOULTRIE,

*Plaintiff-Appellant*,

*v.*

PENN ALUMINUM INTERNATIONAL, LLC,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 11-CV-00500-DRH-DGW — **David. R. Herndon**, *Chief Judge*.

ARGUED DECEMBER 9, 2013 — DECIDED SEPTEMBER 10, 2014

Before WILLIAMS, SYKES, and HAMILTON, *Circuit Judges*.

SYKES, *Circuit Judge*. Levia Moultrie was demoted from his position as a forklift operator at Penn Aluminum's plant in southern Illinois. According to Penn, Moultrie was demoted because of performance problems. Moultrie, however, attributes Penn's decision to racial discrimination and retaliation. He

also claims that Penn's conduct violated its obligations under the collective-bargaining agreement applicable to his employment. The district court entered summary judgment for Penn, and we affirm. Moultrie's breach-of-contract claim is barred by the statute of limitations, and he has failed to provide sufficient evidence to support his discrimination and retaliation claims.

## I. Background

Moultrie began working at Penn Aluminum in 1990. Over the next two decades, he moved between different positions at the plant, including forklift operator, block operator, utility coiler, and scrap chopper. The events giving rise to this litigation began on September 2, 2008, when Moultrie used his seniority to move back into the position of forklift operator. The collective-bargaining agreement gave him two days to show he could perform the job adequately.

Moultrie soon began experiencing performance problems. On September 8 he allegedly hooked up some wires backwards, which caused a delayed shipment. Though Moultrie denies that he made any mistake, he admits something happened that caused the late shipment. Because of this incident, Moultrie began receiving counseling for inadequate job performance from one of his supervisors, Ken Sizemore. On September 10 he received a warning for an unsafe incident involving an oven; a rod sticking out of his forklift damaged the oven door. Moultrie claims this damage was nothing more than a small crease that was not repaired. The record also suggests another performance lapse on September 22:

thermocouple wires were cut because Moultrie hooked them up improperly. This brought another counseling session.

At this point Moultrie had a meeting with another of his supervisors, Paul Crawford, that was documented in a letter placed in Moultrie's file. They discussed his performance problems, and Crawford recounted his initial reservations about Moultrie's ability to keep up in this fast-paced position. The letter goes on to state that "I told Levia that I knew he had a very long, very good work record and that I would hate to have to disqualify him from the job but that it was painfully obvious that he could not keep up with the demand."

Moultrie continued to experience problems. On February 25, 2009, he was written up for placing tags in the wrong piles, which took several hours to sort out. According to Moultrie, others were responsible for this incident. The next day, Jeff Drake (filling in as temporary manager) told Moultrie to operate the chopper, a "dirty" job, while another employee, Dave Billups, operated the forklift, a "clean" job. As a result, Moultrie filed a grievance. The grievance itself mentioned nothing about race. But Moultrie alleges that this incident was racially motivated and that the union refused to include an allegation of racism in his grievance.

On March 4 Moultrie was written up for substandard work and carelessness. This time he had failed to notice that an oven he had turned on earlier that day was not running when it should have been. Moultrie signed the incident report despite claiming that he was doing other work at the time. He was again written up on March 5 for dropping a coil from the forklift, creating an unsafe condition. Though he filed a

grievance after he was disciplined for this action, he does not deny that he dropped the coil. Rather he claims coils are frequently dropped without discipline. On March 19 he was written up again and placed on probation after a March 16 incident involving his failure to turn on an oven. Though he submitted an affidavit claiming this was someone else's fault, he appears to have admitted responsibility in his deposition. His final write-up came on April 2 when he failed to take a load out of the oven, again causing a delay in shipment. He claims this incident occurred because he did not hear his supervisor's instructions. It was the final straw, however, and Penn disqualified him from the forklift position. This amounted to a demotion; Moultrie continued to work at the plant.

Moultrie filed a grievance challenging his disqualification as a forklift operator. Again, this grievance did not mention race, and Moultrie again claims the union representatives refused to include his allegations of racism. Penn held a meeting on April 29—called a "Step 3" meeting in the parlance of Penn's collectively bargained, multitiered grievance process—to address the disqualification. The company issued its decision rejecting Moultrie's grievance on May 21, 2009. Neither the union nor Moultrie filed for arbitration within the ten-day period provided under the collective-bargaining agreement.

Moultrie filed charges of discrimination with the Illinois Department of Human Rights and Equal Employment Opportunity Commission on September 3, 2009. The Illinois agency notified Moultrie on November 16, 2009, that his charge would

be dismissed because it was not supported by substantial evidence. This notice also alerted Moultrie of his right to seek review of the dismissal before the Illinois Human Rights Commission or file a civil action within ninety days. The EEOC sent Moultrie a dismissal and notice of rights along with a right-to-sue letter on March 30, 2011.

Moultrie proceeded to file a complaint in the Southern District of Illinois on June 14, 2011. His complaint alleged a violation of the collective-bargaining agreement, breach of the union's duty of fair representation, racial discrimination (under both Title VII and the Illinois Human Rights Act), and retaliation. As defendants he named Penn, one of Penn's parent companies, and the union. He voluntarily dismissed his claims against the parent company and union, leaving Penn as the only defendant. The district court dismissed the Illinois state-law claim as time barred and entered summary judgment against Moultrie on all remaining claims. Moultrie appealed.[1]

## II. Discussion

We review the district court's grant of summary judgment de novo, construing the evidence and drawing reasonable inferences in favor of Moultrie, the nonmoving party. *Coca-Cola Enters., Inc. v. ATS Enters., Inc.*, 670 F.3d 771, 774 (7th Cir. 2012). Summary judgment is appropriate if the evidence demonstrates that there are no genuine issues of material fact

---

[1] Moultrie died while this appeal has been pending. We have substituted Susan I. Moultrie, the executor of his estate, as the plaintiff-appellant.

and Penn is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Coca-Cola Enters.*, 670 F.3d at 774.

## A. Breach of the Collective-Bargaining Agreement

Moultrie first claims that Penn violated the collective-bargaining agreement by, among other things, moving him from a "clean" job to a "dirty" job and allowing a person with less seniority to take his position. This claim is subject to a six-month statute of limitations under § 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b). *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 155 (1983).[2] The "cause of action accrues from the time a final decision on a plaintiff's grievance has been made or from the time the plaintiff discovers, or in

---

[2] Moultrie claims that the district court should never have allowed Penn to raise this statute-of-limitations defense. Penn requested leave to amend its initial answer to include this defense. The district court allowed the amendment, and doing so was not an abuse of discretion. *See Akrabawi v. Carnes Co.*, 152 F.3d 688, 693 (7th Cir. 1998) ("We review the court's grant of leave to amend a pleading only for an abuse of discretion."). After a pleading can no longer be amended as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2); *see also Larkin v. Galloway*, 266 F.3d 718, 721–22 (7th Cir. 2001) ("Whether or not to grant a defendant's motion to amend her answer is a decision committed to the discretion of the district court."). Allowing the amendment was a valid exercise of the court's discretion; the court properly concluded that Moultrie was not prejudiced by Penn's delay in raising the defense, and Moultrie does not advance such an argument here.

the exercise of reasonable diligence should have discovered, that no further action would be taken on his grievance." *Chapple v. Nat'l Starch & Chem. Co. & Oil*, 178 F.3d 501, 505 (7th Cir. 1999) (internal quotation marks omitted).

In order to determine when the statute of limitations began to run, we must examine the grievance structure in place at Penn. The collective-bargaining agreement sets up a three-step grievance procedure. Step 1 involves the employee bringing the grievance to the attention of an immediate supervisor within five working days of an incident, from which time the supervisor has five working days to respond. If the employee is not satisfied with the supervisor's disposition of the matter, at Step 2 the grievance is reduced to writing and given to the company by the union for settlement by a department head. Once that written grievance is submitted, the company has five working days to settle the matter. If the matter is not settled, the process moves to Step 3. At that point a meeting takes place involving both the union and the company, and the company has thirty working days after that meeting to respond in writing. After receiving that written answer, the parties have ten working days to file for arbitration.

The company issued the Step 3 written report denying Moultrie's grievance on May 21, 2009, placing his deadline for filing for arbitration in early June. The union did not file for arbitration. At that point it should have been clear to Moultrie that the union would take no further action regarding his grievance and that the company's decision was final. Moultrie argues that the statute of limitations never started running because the union allegedly failed to include his claims of racial

discrimination in his grievance. But the time to file any such grievance also had passed. There was simply nothing left to do within the structure established by the collective-bargaining agreement, and Moultrie would not forgo any internal remedies by filing suit at that point. Moultrie first raised this claim against Penn in an amended complaint in October 2011, more than two years after the deadline to file for arbitration had passed. So he must rely on a tolling doctrine in order to avoid the time bar of the six-month statute of limitations.

There is no basis for equitable tolling of the limitations period and no evidence whatsoever that Penn is guilty of fraudulent concealment. Equitable tolling is available when the plaintiff, exercising due diligence, was unable to discover evidence vital to a claim until after the statute of limitations expired. *Chapple*, 178 F.3d at 505–06. Moultrie doesn't point to any such evidence. His breach-of-contract claim mentions violations of the seniority and grievance policies. But Moultrie had a copy of the collective-bargaining agreement that governed seniority issues and grievance procedures, he knew what was written on his grievances, and he had personally experienced the relevant events. He had all the information necessary to raise his claim but failed to bring it in a timely fashion. His argument that the statute of limitations should be tolled due to fraudulent concealment likewise fails for lack of evidence. Moultrie has identified no evidence showing that Penn concealed necessary information from him.

**B. Discrimination**

Next, Moultrie argues that the district court erroneously determined that he failed to put forth sufficient evidence of discrimination. Under the indirect method of proof, on which Moultrie relies, he must establish a prima facie case of discrimination with evidence that: (1) he is a member of a protected class; (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably. *Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002 (7th Cir. 2013). If he satisfies his burden, Penn has an opportunity to identify a legitimate, nondiscriminatory reason for its actions. *Id*. The burden would then shift back to Moultrie to demonstrate that the given reason was pretextual. *Id*.

Moultrie has not established his prima facie case. The evidence does not show that he was meeting his employer's legitimate expectations, nor has he identified similarly situated employees who were treated more favorably.

Moultrie points to no evidence showing that he was performing as expected. There are no performance reviews, formal or informal, indicating that he was a competent forklift operator. Crawford's letter indicates that Moultrie had a good record *before* moving to the forklift position; once in that position, however, it became "painfully obvious that he could not keep up with the demand." His supervisors gave him assistance and time to improve his skills before they demoted him.

Moultrie was also counseled and disciplined due to poor performance on several occasions. Moultrie now disputes some

of the incidents underlying this discipline even though he did not file a contemporaneous grievance. Despite these factual challenges, which are based primarily on Moultrie's own, uncorroborated assertions, some of the incidents remain essentially undisputed. For example, Moultrie acknowledges damaging an oven door on September 10, though he minimizes the extent of the damage. He also admits to dropping a coil on March 5. He failed to notice that an oven was off on March 4; failed to start an oven on March 16; and didn't hear his supervisor's instructions on April 2, resulting in his failure to take a load out of the oven and causing a delay in shipment. Though not related to any discipline, Moultrie also admitted in his deposition that he had "dozed off" while driving the fork truck.

Moultrie likewise fails to provide sufficient evidence showing similarly situated employees from outside his protected class who received more favorable treatment. "Similarly situated employees must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (internal quotation marks omitted). The purpose of this requirement "is to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *Id.* (internal quotation marks omitted).

Moultrie first argues that this requirement should not apply because he is alleging that "he is the only one in the plant who is treated this way and that … is because he was black." If that

were true, there should be *numerous* employees who received more favorable treatment; neither his position nor performance is *sui generis*.

That said, Moultrie has pointed to several employees who he claims satisfy this requirement. However, his litigating position in this regard has been something of a moving target. On appeal he focuses on Dave Billups, a white forklift driver.[3] Specifically, Moultrie claims that Billups dropped several coils and was not disciplined. The evidence of these alleged incidents is sketchy at best; we have no idea when these actions took place or who supervised Billups at the time. Moultrie relies only on his own testimony to substantiate his claims, but he concedes that he lacks personal knowledge of these events. Additionally, Billups apparently was fired for falling asleep while driving a forklift. In short, the evidence does not show that Billups was either similarly situated or received more favorable treatment.

Moultrie ultimately failed to support a prima facie case of discrimination. This resolves both his federal and state-law discrimination claims. The district court found that the state-

---

[3] Though now the sole focus of his argument, Billups was not mentioned in Moultrie's summary-judgment brief. (Though that suggests waiver, it makes no difference in our analysis; the district court concluded Billups did not satisfy the similarly situated requirement and so do we.) That brief did mention three other employees, Anthony Kinsey, Ryan Maclin, and Kent Aspen, none of whom was a valid comparator. Each of these men had been disqualified from the forklift position or even fired by Penn. Prior to that, Moultrie had focused on coworkers holding different jobs or with different supervisors.

law action was untimely and rejected the federal claim on the merits. At oral argument Moultrie conceded that the merits of his state-law discrimination claim would rise or fall with the merits of the federal claim.[4] Because his federal claim fails, so too does his state-law claim, and we do not need to address the timeliness issue.

**C. Retaliation**

Finally, Moultrie argues that the district court erred in entering summary judgment on his retaliation claim. Retaliation may be established by either the direct or the indirect method of proof. Moultrie relies on both, and we begin with the direct method, which requires the plaintiff to show: (1) that he engaged in activity protected by the statute; (2) that his employer took an adverse employment action against him; and (3) that there is a causal connection between the plaintiff's protected activity and the adverse employment action. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630–31 (7th Cir. 2011).

---

[4] The standards for Illinois state-law discrimination claims mirror those for Title VII claims. *See, e.g.*, *Owens v. Dep't of Human Rights*, 936 N.E.2d 623, 640 (Ill. App. Ct. 2010) ("To establish a *prima facie* case of employment discrimination, the petitioner must first show that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate business expectations; (3) he suffered an adverse employment action; and (4) the employer treated similarly situated employees outside the class more favorably.").

Moultrie alleges that he engaged in protected activity by complaining of racial discrimination to his temporary supervisor Jeff Drake on February 27, 2009.[5] After he was temporarily assigned to a "dirty job" while his white coworker Billups was given a "clean job," Moultrie claims that he asked Drake "if Dave Billup[s] [was] black and I was white, would you put him back here?" Drake denies this took place.

Even if we generously assume that this complaint constitutes protected activity, Moultrie has not connected it to his demotion. Apart from allegedly suspicious timing—Moultrie was written up several times following this alleged complaint, though his performance problems arose well before that—no evidence demonstrates that the demotion was caused by his protected activity. And "[s]peculation based on suspicious timing alone … does not support a reasonable inference of

---

[5] He also points to his grievances and a complaint to union representative Paul Crawford. However, the grievances did not contain any reference to his race or complaints of racial discrimination. Even if his initial discussions with union representatives mentioned racial discrimination, Penn did not know about those allegations, which is fatal to his claim. *See Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009) ("In order to establish retaliation pursuant to Title VII, the employer must have had actual knowledge of the protected activity in order for its decisions to be retaliatory; it is not sufficient that [an employer] could or even should have known about [an employee's] complaint." (internal quotation marks omitted)). His claim that he told Crawford that his write-ups were racially motivated is not supported by the record; Moultrie does not say when this complaint took place, and when asked in his deposition whether he "ever complained to Mr. Crawford about race," Moultrie responded: "I was mad when I was talking to him so I don't know what I said to him."

retaliation." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000).

Moultrie's reliance on the indirect method fares no better. The indirect method of proof for retaliation mirrors that for discrimination. Specifically, Moultrie must show that he: (1) engaged in statutorily protected activity; (2) met his employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in protected activity. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 983 (7th Cir. 2014). Several problems with Moultrie's theory are readily apparent. First, he struggles to identify any evidence of protected activity. And as we discussed in analyzing his discrimination claims, his on-the-job performance was seriously inadequate, and he has failed to point to similarly situated employees who received more favorable treatment. Because Moultrie cannot show retaliation under either method of proof, summary judgment on this claim also was proper.

AFFIRMED.