In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1881

MYRON MINTZ,

*Plaintiff-Appellant,*

*v.*

CATERPILLAR INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:12-cv-01174-JBM-JEH — **Joe Billy McDade**, *Judge.*

ARGUED DECEMBER 2, 2014 — DECIDED JUNE 5, 2015

Before WOOD, *Chief Judge,* and WILLIAMS and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Myron Mintz sued his employer Caterpillar, Inc., alleging claims of race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964. Caterpillar sought summary judgment, Mintz did not file a timely response, and the district court granted Caterpillar's motion. That prompted Mintz to file a motion to vacate the district court's order, for an extension of time to file

a summary judgment response, and/or to file a motion to reconsider. Thereafter, Mintz filed a response to Caterpillar's summary judgment motion. Treating Mintz's motions collectively as a motion for relief from judgment under Federal Rule of Civil Procedure 60(b), the district court denied relief. Mintz appeals. Although the district court erred in treating Mintz's motions as a Rule 60(b) motion, we affirm its judgment.

I.    FACTS

Mintz, an African American, began working at Caterpillar in 2005 in its manufacturing engineering development program. Caterpillar manufactures a variety of heavy industrial equipment. This case focuses on Caterpillar's manufacture of track-type tractors at its East Peoria, Illinois facility. For simplicity, this type of tractor is the central part of what most readers would think of as a bulldozer. These tractors are built in various sizes for many different uses and are sold all over the world. The purchasing customers often specify that the tractors be built in particular configurations offered by Caterpillar to meet the varied uses that may be required. An assembly line construction process is used by Caterpillar, with the sequence of construction being conducted in different letter designated buildings throughout the East Peoria site, but more about that later.

Mintz was promoted to the position of manufacturing engineer in December 2007. As such, he was an intermediary between the engineering design department and the production floor. The engineering design department would give him design prints of various tractors to be constructed. Mintz was then responsible for reviewing the prints and writing detailed work instructions for production employ-

ees, identifying the tooling and materials that would be needed to build specific parts of the tractors. His initial manufacturing engineering assignment involved supporting what was called the "black iron" assembly line which was located in Building SS of the East Peoria site, and his immediate supervisor was Chuck Turpen. In the first quarter of 2010, Mintz moved to building LL to support the "track roller frame" assembly line and he continued to be supervised by Turpen until January 2011 when he began reporting to Ryan Rumler instead, although his duties remained unchanged.

A central function of Mintz's duties as a manufacturing engineer was to manage "grief" and "engineering change orders." The "change order" term is common in many manufacturing and construction settings but "grief" has a special meaning in the Caterpillar world which requires explanation. Simply put, "grief" as used at Caterpillar and throughout the rest of this opinion means discrepancy between what the customer ordered and what the production employees are scheduled to build on the production line. If there is variance between the customer's order and the parts, quantities, and materials projected by the manufacturing engineer in issuing instructions for the construction of the tractor, the difference is referred to as grief. Grief is tracked in Caterpillar's computer system, and it must be fixed, or resolved, before a tractor is built. Caterpillar categorizes two types of grief: MBM grief and 1410 grief. MBM grief is all of the grief in the Caterpillar system throughout the course of a particular build. 1410 grief is more urgent because it is grief that remains in the production system close to the build date of a particular tractor. Resolving all of the grief is important but eliminating the 1410 grief is a critical priority because it con-

sists of errors and discrepancies for building projects that will soon come down the production line. The goal is to have zero grief because if all of the grief is not resolved, adverse consequences could include shutting down the production line, having to tear down and reconstruct a particular tractor, or building the wrong tractor for a customer. Responsibility for resolving the grief ultimately falls to the manufacturing engineer, and it must be done before any particular tractor is built.

Engineering change orders are initiated by the design department and are then sent to the manufacturing engineers to have new work instructions written. The manufacturing engineers receive the change orders with a due date by which the new instructions must be completed. The timeliness of the new instructions is also critical to the smooth functioning of the production line. If not timely, the production line can build an incorrect configuration or an assembly that deviates from a customer order. As with zero grief, Caterpillar's expectation is that all change orders will be completed by manufacturing engineers by their due dates.

Caterpillar evaluates the performance of its manufacturing engineers four times annually, once each of the first three quarters on an interim basis, and at year end. The year-end evaluation covers performance for the entire year and is used as the basis of determining raises and the employee's status going forward. The interim evaluations do not affect an employee's pay or other status. Caterpillar used an evaluation scale for manufacturing engineers of 1 through 5 with 1 being highest and 5 the worst. A 3 rating had three subcategories, A, B and C, with A being the highest and C the lowest.

In January 2011, Mintz was provided his year-end evalu-ation for 2010, which had been prepared by Turpen. Mintz received an overall rating of "3B-Valued Performance." However, the portion of his evaluation that involved grief and engineering change orders was rated "does not meet." Specific criticisms were made regarding both change orders and grief. As to change orders, the evaluation indicated: "Myron was not able to stay current on his folders and the quantity of past due folders at a reasonable level. His daily average for past due folders was 5.5, which was about twice the average for the manufacturing engineering team as a whole." As to grief, it reported: "Myron had difficulty keep-ing his grief at an acceptable level. There was some down-time experienced on the line as a result of processing grief." Mintz does not dispute his 2010 evaluation. Rather, he con-tends that race discrimination began when his supervision was transferred to Rumler.

Before the switch in supervision, Turpen attempted to address with Mintz his grief and change-order deficiencies. In June 2010, Turpen emailed Mintz stating: "Myron, you currently have 1/3rd of our (manufacturing engineering in-cluding G&DI) total MBM grief, 1410 grief and past due folders. 1) [W]hat is causing the grief? 2) [H]ow are you go-ing about dealing with it? 3) [W]hen will we have this under control?" Turpen met with Mintz in December 2010 to de-velop a plan to lower the amount of Mintz's grief. Turpen said that Mintz resisted taking responsibility for his grief.

In January 2011, Rumler met with Mintz to discuss goals and expectations, including Rumler's expectation that Mintz would reduce his grief levels and number of past due change orders. Thereafter, they met on a monthly basis, at-

tempting to assess and lower Mintz's 1410 and MBM grief. But his first interim quarterly review of 2011 resulted in a lower "3C-Valued Performance" rating. Although all of the "3" ratings (A, B and C) are considered acceptable, a 3C rating indicates that the employee needs additional coaching and supervision in order to perform his job. While discussing this interim evaluation, Rumler told Mintz that his MBM and 1410 grief were too high and that he needed more coaching than other manufacturing engineers.

Mintz believed that his 3C rating was discriminatory on the basis of race. Mintz was the only African American engineer working in the area at Caterpillar. He believed that he "gave [his] all in the job" and that his rating did not account for his accomplishments on the line. His second quarter 2011 rating was also a 3C, and Rumler's explanation of it to Mintz was similar. Mintz again believed that this rating was discriminatory and retaliatory. As with the other rating, he believed that it did not account for his accomplishments.

For the third quarter, Mintz received a "4-Needs Improvement," which signifies unacceptable performance and requires an improvement plan. It also foreshadows potential termination. Rumler based that rating on what he deemed to be unacceptable grief, past due engineering change folders, and errors that resulted in having to tear down and rebuild tractors at substantial cost to Caterpillar. Mintz believed that this rating was discriminatory and retaliatory because he was the only African American engineer in his department, he had complained about discrimination, and, in his view, the rating was unfair and did not account for his accomplishments.

As a result, Mintz was placed on an employee action plan in October 2011. The plan indicated that it was based on "[u]nacceptable levels of 1410 and MBM grief—Myron currently has 129 lines of 1410 grief and 4460 lines of MBM grief," "[p]ast due engineering change folders—Myron has 25 past due engineering folders currently," "[w]ork ticket errors resulting in tractor rework—[o]ver thirty-six hours of rework from incorrect work tickets in TRFA year to date," and problems with "[c]ommunication and prioritization of work activities." The plan also indicated that the amount of coaching and direction that Mintz required was unacceptable for a management level employee, more than what would be expected for a 3B or C level rating. It also noted that Mintz was not improving from his previous 3C ratings and was failing to meet requirements and commitments in several areas. The meetings between Mintz and Rumler became weekly events to consider whether the action plan's expectations were being met, especially with respect to grief and change orders.

In 2011, Rumler assigned interns and a full-time employee at different times to assist Mintz in resolving his grief and change order deficiencies. He also allowed Mintz to work overtime and during a shutdown for the same purpose.

Mintz received his 2011 year-end evaluation in February of 2012. It was also a "4-Needs Improvement" rating with a "does not meet" assessment of his grief and past due change orders. To quantify the deterioration of his change order performance, the evaluation noted that Mintz had 18 past due change order folders at the prior year end but at the time of this review, he was past due with 132 change order folders. His grief performance had also worsened. Mintz began Jan-

uary 2011 with 1547 lines of grief; as of January 1, 2012, he had 5790 lines of MBM grief and 682 lines of 1410 grief. The evaluation also noted that tear down hours and assembly line down time occurred as a result. Mintz testified that "to have 100 lines of 1410 grief isn't really bad. It's bad when it gets in the five hundreds or six hundreds." He agreed that grief is bad and should be avoided. Nonetheless, Mintz believed that this rating was based on his race and was retaliatory because he was the only African American engineer, he had complained about race discrimination, and, in his view, the rating did not account for his accomplishments and was unfair.

In the meantime, Mintz complained of racial discrimination. On May 19, 2011, he emailed Caterpillar's human resources department, alleging that his first quarter 2011 evaluation was the result of racial discrimination. This was his first claim of race discrimination at Caterpillar. At some point, Rumler learned that Mintz had complained of discrimination but it was unclear when in the process of his evaluations he learned that. As Mintz gets the benefit of favorable inferences, and just as the district court did, we will assume that Rumler learned of it prior to the issuance of the 2nd quarter 2011 and later evaluations. Mintz suffered no direct consequence because of the 2011 quarterly evaluations but the adverse year-end one did result in a $9,500 difference in his bonus payment.

Mintz had no evidence of any race-related comments or jokes by Rumler or Turpen, nor did he produce evidence that any of his managers or supervisors ever said anything that was racially offensive to him. He admitted that no one at Caterpillar made any retaliatory comments to him. And

he concedes that he did not identify any Caterpillar employ-ee that he believes was treated better than him on matters of discipline, performance, hiring, promotion, transfer, com-pensation, company policies, or any other terms or condi-tions of employment.

In March 2012, Mintz transferred to another department at Caterpillar where he remains employed as of this appeal.

After this case had proceeded though pretrial matters, in-cluding discovery, Caterpillar filed a motion for summary judgment, contending that Mintz would be unable to present evidence from which a jury could infer that his poor evalua-tions were the result of racial or retaliatory animus. Mintz failed to file any response to the motion by the deadline for doing so. Several weeks later, the district court issued an or-der granting the motion. A few hours later, Mintz filed a mo-tion to vacate the summary judgment ruling, which also sought a week to file a response to the summary judgment motion and/or to file a motion to reconsider. The motion to vacate represented that Caterpillar's counsel had agreed to a request for a 3-week extension of time to respond to its summary judgment motion and that Mintz's counsel pre-pared a timely motion for extension which he believed he had filed. Counsel contended that he either forgot to file the motion or that some error was made by the court's electronic filing system. About a week later, before the court ruled on the motion to vacate, Mintz filed a motion for leave to file a summary judgment response instanter, along with a copy of the proposed response.

The district judge denied the motion to vacate and the motion to file a belated response, treating them as an effort pursuant to Federal Rule of Civil Procedure 60(b) to obtain

relief from a final judgment or order. The district judge did, however, indicate that he reviewed Mintz's belated summary judgment submission and determined that nothing in it would have affected the grant of summary judgment. On the same date as it denied the motion to vacate, the district court issued a final judgment in favor of Caterpillar pursuant to Federal Rule of Civil Procedure 58. Mintz's notice of appeal was filed approximately 6 days thereafter.

## II.    DISCUSSION

We review the district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to Mintz and drawing all reasonable inferences from the evidence in his favor. *Huang v. Cont'l Cas. Co.*, 754 F.3d 447, 450 (7th Cir. 2014). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

An employer who discriminates against an employee because of his race or retaliates against him for protesting unlawful discrimination violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, 2000e-3, and 42 U.S.C. § 1981. We apply the same standards to Title VII and § 1981 discrimination and retaliation claims. *Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002 (7th Cir. 2013).

Before getting to the merits, we provide the district court procedural guidance. As noted, the court treated Mintz's motion to vacate and motion to file a belated summary judgment response collectively as a Federal Rule of Civil Procedure 60(b) motion. But Rule 60(b) provides that district

courts "may relieve a party or its legal representative from a *final* judgment, order, or proceeding" for the enumerated reasons. Fed. R. Civ. P. 60(b) (emphasis added). Thus the rule "applies only to 'a final judgment, order, or proceeding.'" 11 Charles Alan Wright, *et al.*, *Federal Practice and Procedure Civil* § 2852 (3d ed. 1998). It does not limit a district court's discretion to reconsider "an interlocutory judgment or order at any time prior to final judgment." *Id.*; *see Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571–72 (7th Cir. 2006) (noting that Rule 60(b), "by its terms limited to 'final' judgments or orders, is inapplicable to interlocutory orders" and that the district judge's authority "to reconsider a previous ruling in the same litigation … is governed by … the law of the case"). When Mintz filed his motions to vacate and for leave to file a summary judgment response, no final judgment had been entered yet. Thus, Rule 60(b) was inapplicable and the district court had the discretion to reconsider its prior summary judgment ruling in light of Mintz's belated response. In any event, despite denying what it erroneously treated as a Rule 60(b) motion, the court did review the belated submission and decided that it would not have affected the grant of summary judgment in this case.

A plaintiff claiming race discrimination can use either the direct or indirect method of proof, *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 790 (7th Cir. 2015), but Mintz proceeds under the indirect method only. Under that method, he must first establish a prima facie case, namely that: (1) he is a member of a protected class; (2) he suffered an adverse employment action, (3) he was meeting his employer's legitimate expectations at the time of the adverse action, and (4) the employer treated similarly situated employees not in the protected class more favorably. *Moultrie v. Penn Alumi-*

*num Int'l, LLC*, 766 F.3d 747, 752–53 (7th Cir. 2014). If Mintz demonstrates a prima facie case, the burden shifts to Caterpillar to articulate a legitimate nondiscriminatory reason for the employment action. *Id.* at 753. If it does so, Mintz must show pretext. *Id.*

Mintz has not demonstrated a prima facie case. Although he has evidence of an adverse action—the 2011 year-end evaluation that adversely impacted his bonus payment, he cannot make out the final two elements of a prima facie case.[1] The evidence establishes that he was not meeting Caterpillar's legitimate expectations, and Mintz has produced no evidence that Caterpillar treated similarly situated employees more favorably than he.

It is undisputed that a critical responsibility of a manufacturing engineer such as Mintz was to manage grief and engineering change orders. While Mintz highlights his successes on the job—his value stream, his safety record, and increased production of tractors from 2010 to 2011—he does not dispute his high levels of grief and past due change orders. Instead, he argues that "zero grief" was not a realistic expectation. But whether zero grief was a realistic expectation is not for us to decide. The same holds true for Caterpillar's expectation of zero past due change orders. A federal court does not sit as a "super-personnel department," second-guessing an employer's legitimate concerns about an employee's performance. *Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012); *see Makely v. Mktg. Alts., Inc.*, No. 93 C 1189, 1995 WL 42358, at *6 (N.D. Ill. Feb. 2, 1995) (rejecting

---

[1] Even if that evaluation did not affect Mintz's bonus payment, Caterpillar conceded that it was an adverse action.

plaintiff's argument that his employer's goals "were unrealistic and hence not legitimate expectations").

Even if Mintz is right that the zero goal was unrealistic, he cannot show that he was meeting Caterpillar's legitimate expectations. Mintz's grief levels were nowhere near zero. Even Mintz himself testified that 1410 grief levels "in the five hundreds or six hundreds" was "bad." And the unrefuted evidence was that his 1410 grief reached that level. Similarly, at the time of his 2011 year-end review, Mintz had 132 past due change orders. Therefore, Mintz has not produced sufficient evidence to raise a genuine issue of fact as to whether he was meeting Caterpillar's legitimate expectations.

Furthermore, even if Mintz could raise an issue as to that element of his prima facie case, he has not identified any employee with similar grief and engineering change orders whom Caterpillar treated more favorably. This is an independent reason why he failed to establish a prima facie case of race discrimination. Moreover, even if Mintz could establish a prima facie case, he has not raised a triable issue as to pretext.

Turning to the retaliation claims, to prevail under the direct method, Mintz must show "(1) that he engaged in activity protected by the statute; (2) that [Caterpillar] took an adverse employment action against him; and (3) that there is a causal connection between [his] protected activity and the adverse employment action." *Moultrie*, 766 F.3d at 754. Under the indirect method, he must demonstrate that he: "(1) engaged in statutorily protected activity; (2) met [Caterpillar]'s legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than sim-

ilarly situated employees who did not engage in protected activity. *Id.* at 755.

The district court seems to have conflated the two methods by requiring Mintz to show that he met Caterpillar's legitimate expectations under the direct method of proof. This was error, but it was inconsequential since Mintz's evidence fails to raise a genuine issue of fact as to a causal connection between his complaint of race discrimination in May 2011 and his 2011 year-end performance evaluation, which Mintz received about nine months later in February 2012. Although this evaluation came after Mintz's complaint, the passage of considerable time between the two events suggests no connection between them. *See Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015) (concluding that six months between the employee's complaint and adverse action was "by itself insufficient to support an inference of causation"), *petion for cert. filed*, (Apr. 13, 2015) (No. 14-9355).

Furthermore, "speculation based on suspicious timing alone … does not support a reasonable inference of retaliation." *Moultrie*, 766 F.3d at 755 (quotation omitted). Even if the timing was "suspicious," which it was not, speculation based on timing alone is all that Mintz has to support his claim of a causal connection. Without "corroborating evidence that supports an inference of causation," *Sklyarsky* 777 F.3d at 898, he cannot survive summary judgment using the direct method. Mintz has identified no evidence to suggest that his complaint of race discrimination caused his poor performance evaluation. Moreover, as discussed, Mintz was not meeting Caterpillar's legitimate expectations, so he cannot prevail using the indirect method either.

Accordingly, we AFFIRM the district court's judgment.