In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 14-3753 & 15-1616

MELVIN PHILLIPS, et al.,

*Plaintiffs-Appellants*,

*v.*

SHERIFF OF COOK COUNTY, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:09-cv-00529 — **Joan Humphrey Lefkow**, *Judge*.

ARGUED FEBRUARY 11, 2016 — DECIDED JULY 6, 2016

Before KANNE, RIPPLE, and WILLIAMS, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Plaintiffs Melvin Phillips, Malcolm Patton, Rodell Sanders, and Frank Powicki are current and former detainees of Cook County Jail (the "Jail"). They brought a class action under 42 U.S.C. § 1983 against Cook County, Illinois, and the Sheriff of Cook County (collectively, "Cook County"), claiming that the level of dental care they received at the Jail demonstrated deliberate indifference in violation of the Eighth and Fourteenth Amendments. The

district court originally certified two classes of plaintiffs under Federal Rule of Civil Procedure 23. However, the district court subsequently decertified one class, modified the other class, and determined that the detainees' motion for injunctive relief was moot. The detainees timely appealed the district court's decision to decertify. While that appeal was pending, the detainees moved for a new trial under Federal Rule of Civil Procedure 60(b) based on newly discovered evidence, but the district court denied the motion. The detainees timely appealed this denial as well, and we consolidated the two appeals. We now hold that the district court acted well within its discretion in decertifying the two classes because of the lack of a common issue of fact or law. Further, the filing of a Rule 60(b) motion during this interlocutory appeal was inappropriate because there was no final judgment in the case. Moreover, because the district court took no action that substantially altered its decision on the decertification issue, we cannot treat its disposition of the Rule 60(b) filing as the appeal from a motion for reconsideration. Accordingly, we affirm the district court's decision to decertify the class and dismiss the appeal from the court's disposition of the Rule 60(b) motion.

# I

The plaintiffs ask us to review two aspects of the proceedings in the district court. First, they ask that we review the decision to decertify a class of litigants. Second, they ask that we review the district court's disposition of the Rule 60(b) motion.

We first address the district court's decision to decertify the classes that it had previously certified. This issue requires, as our colleague in the district court correctly recognized, that we apply the decision of the Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), a task we have undertaken several times before.[1]

## A.

This case got underway when a former detainee at the Jail brought a civil action in the Northern District of Illinois on January 27, 2009, alleging that Cook County showed deliberate indifference in its administration of dental care. Five detainees subsequently joined the lawsuit.[2]

On November 10, 2010, the district court ordered that the case proceed as a class action under Federal Rule of Civil Procedure 23(b)(2) for "[a]ll persons presently confined at the … Jail who are experiencing dental pain and who have waited more than seven days after making a written request for treatment of that pain without having been examined by a dentist."[3] At that time, the court was of the view that the

---

[1] *See, e.g, Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 374–75 (7th Cir. 2015); *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of Chi.*, 797 F.3d 426, 433 (7th Cir. 2015); *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 755 (7th Cir. 2014); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013); *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 493 (7th Cir. 2012).

[2] The originally named plaintiff, John Smentek, is no longer a part of the case for reasons not disclosed by the record.

[3] R.68 at 15. When certifying a class, a district court must first find that the four requirements of Federal Rule of Civil Procedure 23(a) have been met:

class members shared a common question based on the "defendants' decision to reduce dental services at the jail, particularly in reducing the number of dentists employed there to one."[4] The district court concluded in a subsequent order that the case could also proceed as a class action under Rule 23(b)(3).[5]

After discovery, the detainees moved for preliminary and permanent injunctions on January 6, 2014. They asked the district court to require the defendants:

> 1.     To screen health service requests complaining about dental pain on a daily basis,
>
> 2.     To provide a procedure for detainees complaining about dental pain to obtain prompt access to pain reduction medicine (e.g., ibuprofen), and
>
> 3.     To maintain records of requests for dental treatment, including dates inmates

---

(1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Once the district court determines that these four requirements have been met, the court must then determine whether the class meets the requirements of one of the categories listed in Federal Rule of Civil Procedure 23(b). Rule 23(b)(2) concerns classes that seek classwide injunctive relief. Rule 23(b)(3) concerns classes that present claims where common questions predominate.

[4] R.68 at 13.

[5] The defendants took an interlocutory appeal from this order on grounds unrelated to this current appeal. We affirmed the district court's grant of certification. *Smentek v. Dart*, 683 F.3d 373, 377 (7th Cir. 2012).

> are scheduled to be examined by dental personnel, dates inmates are actually examined by dental personnel, and documentation of cancellation or failure to appear for dental treatment or examination.[6]

In response, the defendants moved to decertify the classes. The district court stayed briefing on the motion to decertify and then held a six-day bench trial on injunctive relief in June 2014.

The pleadings and the record of the bench trial establish the following facts. The Jail has a population of approximately 9,500 detainees. The average length of stay at the Jail is fifty-seven days, and the median length of stay is twelve days. Cermak Health Services ("Cermak"), a division of the Cook County Bureau of Health, provides dental care to the detainees at the Jail.

In 2008, the Department of Justice ("DOJ") filed an action under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997 et seq., which charged, among other allegations, that the Jail provided "inadequate medical care." *United States v. Cook Cty., Ill.*, 761 F. Supp. 2d 794, 796 (N.D. Ill. 2011).[7] Cook County entered into a consent order with the DOJ in May 2010, agreeing to improve conditions at

---

[6] R.236 at 1.

[7] The DOJ's lawsuit is not directly related to this class action, which began in January 2009. However, this lawsuit provides some important background, and many of the reports created pursuant to that lawsuit are relevant in this dispute.

the Jail and to allow regular monitoring from the federal government. The consent order mandates that:

> a. Cermak shall ensure that inmates receive adequate dental care, and follow up, in accordance with generally accepted correctional standards of care. Such care should be provided in a timely manner, taking into consideration the acuity of the problem and the inmate's anticipated length of stay. Dental care shall not be limited to extractions.
>
> b. Cermak shall ensure that adequate dentist staffing and hours shall be provided to avoid unreasonable delays in dental care.[8]

Prior to the DOJ action, in 2007, Cermak employed only one dentist, and his sole contribution to the inmates' dental health was extractions. As of 2014, however, Cermak employed seven dentists, two dental hygienists, and seven dental assistants. The plaintiffs' expert, Dr. Jay Shulman, described this level of staffing as "optimum."[9]

Upon experiencing dental pain, a detainee can either complain directly to a nurse or officer, or submit a Health Service Request form ("HSR"). Under Cermak's policy, HSRs must be retrieved daily and reviewed by a registered nurse. When the

---

[8] R.71-2 at 37.

[9] R.449 at 146.

HSR includes a complaint about dental pain, the policy requires that a qualified health professional examine the detainee within twenty-four hours. Despite the policy, Dr. Shulman opined that "face-to-face examinations by nursing staff are not consistent[ly]" performed.[10]

HSRs are then provided to the dental clinics. The clinics categorize the requests as emergency, urgent, priority, or routine. Appointments are then scheduled based on the type of request. A 2014 monitor's report found that "[t]he current dental wait time for immediate and urgent HSRs is one to three days. Routine dental HSR wait time is reported to be about 30 days. It unfortunately remains true, however, that it is extremely difficult [if] not impossible to verify the dental wait time."[11]

After an initial appointment, Cermak may schedule either a return appointment or an oral surgery at Stroger Hospital. Detainees who believe their care was inadequate at any stage in this process can file a grievance with a counselor at the Jail. Any grievances which concern medical issues are forwarded to Cermak and then faxed directly to a member of the dental staff if they involve dental needs.

Eight detainees testified about their dental treatment on behalf of the plaintiffs. Because their testimony is necessary for an understanding of the issues on appeal, we set it forth in some detail. Jonathan Williams testified that he complained

---

[10] *Id.* at 86.

[11] R.384 at 78. The district court took judicial notice of this monitor's report after trial. *See* R.389.

of tooth pain in April 2010 and had a tooth extracted in June 2010. However, he "believe[d] they took out the wrong tooth. And [he] notified them."[12] According to Mr. Williams, he was seen by the dental clinics about a dozen more times over the next three years, where he received fillings and tooth cleanings. Several times, the dentists referred Mr. Williams to Stroger for oral surgery related to the tooth that should have been extracted and provided him with pain medication. However, Mr. Williams did not undergo surgery. He then submitted several HSRs related to pain in early 2013, which did not receive a response. Mr. Williams again was referred to Stroger in March 2014, and finally had his tooth extracted in May 2014. At the bench trial in early June 2014, Mr. Williams noted that he had "stitches in [his] mouth right now that just hang[] down," and that, despite requests for assistance, "they haven't been addressed."[13]

Terrance Olden testified that he submitted a series of HSRs beginning in January 18, 2013, in which he complained of a toothache and asked that his tooth be extracted. He said that, at least by January 28, 2013, he "was supposed to be scheduled to get a tooth pulled."[14] Mr. Olden did not get evaluated at Stroger until June 10 and did not get his tooth extracted until October 11. Mr. Olden acknowledged that he saw a dentist ten different times throughout 2013 for different treatments. Mr. Olden also acknowledged that he was prescribed and then received pain medication eleven times during that same

---

[12] R.449 at 197.

[13] *Id.* at 212.

[14] R.451 at 215.

period. However, he testified that there were times, prior to the extraction, in which he did not have pain medication—and that he submitted HSRs to that effect.

Mr. Olden further testified that he submitted an HSR on January 10, 2014, and on "that same night[,] a nurse came on the deck to issue medication" and "s[aw] [his] face."[15] He also submitted an HSR on January 13 and two more on January 15, but did not receive face-to-face evaluations. Mr. Olden had a dental appointment "sometime at the end of the month of January" 2014.[16] The dentist extracted a tooth, and Mr. Olden testified that the pain subsided.[17]

John Saiger testified that a piece of his wisdom tooth broke off on March 23, 2013. He submitted two successive HSRs, but did not receive a face-to-face evaluation. Mr. Saiger then submitted a grievance on June 5, noting that he had not received an evaluation. In response, the Jail scheduled a dental appointment for the end of June. Mr. Saiger then moved divisions, and the appointment was rescheduled. He did not receive a dental appointment until September 2013. At that time, the dentist determined that an extraction would be necessary and told Mr. Saiger that a return appointment would be scheduled in a week. However, Mr. Saiger did not return

---

[15] *Id.* at 211.

[16] *Id.* at 213.

[17] Mr. Olden opted out of the class and filed an individual lawsuit. The parties in Mr. Olden's case submitted a stipulation of dismissal. Stipulation, *Olden v. Cook Cty.*, No. 1:13-cv-05283 (N.D. Ill.) (R.66).

to the clinic and have his tooth extracted until January 19, 2014.[18]

Kenneth Weatherspoon had a tooth extracted by Cermak in 2012. He testified that he submitted an HSR on April 4, 2013, complaining of an abscess in his upper right jaw, where the tooth had been extracted. He did not receive a face-to-face evaluation, but he was seen by a dentist on April 23. The dentist examined Mr. Weatherspoon and referred him to Stroger "[b]ecause there was nothing that she could do."[19] Mr. Weatherspoon submitted several grievances, but, at the time of the bench trial in May 2014, he had not had an appointment at Stroger. He did testify that he had two appointments in the dental clinic in 2014, one for an examination and one for a filling.

Orlando Allen testified that he had submitted two or three HSRs complaining of dental pain before he received an appointment sometime around May 17, 2013. At that appointment, the dentist determined that Mr. Allen's tooth was too

---

[18] Mr. Saiger also opted out of this class and has an individual lawsuit pending. *Saiger v. Dart*, No. 13 C 5495, 2015 WL 1433076, at *1 (N.D. Ill. Mar. 26, 2015); *see also Saiger v. Dart*, No. 13 C 5495, 2016 WL 98573, at *5 (N.D. Ill. Jan. 8, 2016).

[19] R.450 at 116. The parties appear to dispute the reason that the dentist referred Mr. Weatherspoon to Stroger. Mr. Weatherspoon testified that he was referred for "oral surgery." *Id.* at 118. However, Cook County contends that he "was referred to Stroger for a pathology consult not an extraction." Appellees' Br. 11. The dentist testified that she could not find anything wrong with Mr. Weatherspoon's gums and referred him to Stroger to see if they could identify something that she had missed. R.452 at 141.

swollen to be removed at that time. Mr. Allen was pre-scribed—and subsequently received—ibuprofen and penicillin. His tooth was then operated upon a few days later, on May 23, 2013. Mr. Allen also testified that he experienced a separate dental issue in October 2013. He submitted an HSR on October 28, received a face-to-face evaluation on October 29, and then visited the dental clinic on October 31.

Quentin Scott testified that he submitted an HSR complaining of tooth pain on August 6, 2013. That same day, he had a face-to-face evaluation with a physician's assistant who prescribed aspirin and ibuprofen. Mr. Scott then saw a dentist two days later, on August 8. The dentist referred him to Stroger and prescribed antibiotics and pain medication. Mr. Scott did not receive the medication for at least one month. On November 5, 2013, Mr. Scott visited Stroger and had x-rays taken. Mr. Scott did not visit Stroger again until March 28, 2014, when his teeth were extracted.

Stanford Thompson testified that he chipped his tooth during lunch sometime in August 2013 and asked a corrections officer if he could be sent to a medical unit. The officer refused and instead told Mr. Thompson to fill out an HSR. Mr. Thompson submitted an HSR, but he did not receive an evaluation. A few weeks later, Mr. Thompson visited the dispensary for an unrelated issue and informed the doctor of his tooth pain. The doctor prescribed ibuprofen, but Mr. Thompson never received the medication. Mr. Thompson then filed a grievance on August 27, 2013. He subsequently saw a dentist in early September, who prescribed medication (which Mr. Thompson received) and informed him that he had been "scheduled to get the tooth pulled … September 19th. But when she s[aw] the state of it, … she was going to speed up

the process."[20] Mr. Thompson's tooth was extracted on or around September 10, 2013.[21]

Jason Knickrehm testified that he submitted an HSR on October 8, 2013, complaining of a broken tooth and a toothache, but did not receive any response. He submitted a second HSR and a grievance on October 20. Mr. Knickrehm was then seen in urgent care the next day and was prescribed medication. However, he testified that he never received that medication. Mr. Knickrehm was then seen in the dental clinic on November 21. The dentist determined that a few of Mr. Knickrehm's teeth would need to be extracted, and expressed an intention to schedule that appointment within the next week. However, Mr. Knickrehm did not receive a return appointment until December 19. Three days earlier, on December 16, Mr. Knickrehm submitted a grievance that complained about his wait. The dentist only extracted one tooth at this appointment and then prescribed additional medication. Mr. Knickrehm did not receive that prescription, and the remaining teeth were not extracted until January 31, 2014.

---

[20] R.452 at 31.

[21] Like Mr. Olden and Mr. Saiger, Mr. Thompson opted out of the class and filed an individual lawsuit. A district court granted a motion for summary judgment in favor of the defendants in that case. *Thompson v. Taylor*, No. 13 C 6946, 2016 WL 164340, at *11 (N.D. Ill. Jan. 14, 2016).

After considering this evidence, the district court denied the motion for a preliminary injunction. The court later decertified the Rule 23(b)(2) class, modified the Rule 23(b)(3) class, and denied the motion for a permanent injunction as moot.

First, the court looked at the commonality requirement of Rule 23(a)(2). The court explained that the class members' claims needed to "share some question of law or fact that can be answered all at once and that the single answer to that question will resolve a central issue in all class members' claims."[22] In its original certification, the court found a common question concerning the inadequately low number of dental staff. However, the increase in the number of dentists eliminated this common question. Further, Cermak had implemented policies that aligned with national standards.

The court could not find another common factor among all of the detainees' claims, noting that "treatment of dental pain may fall below the deliberate indifference threshold for many reasons and at many stages."[23] The court therefore found that the merits of each plaintiff's claim of deliberate indifference would necessarily "depend[] on the facts of the individual case."[24] The detainees proposed some new common questions, particularly ones about the Jail's failure to provide face-to-face evaluations within twenty-four hours of an HSR and its failure to provide timely return to clinic appointments. However, the court found that these questions "raise[d] two

---

[22] R.390 at 14–15 (emphasis omitted) (internal quotation marks omitted).

[23] *Id.* at 16.

[24] *Id.* at 17.

separate causes" for a detainee's pain, which proved that there was no common issue that could be assessed class-wide.[25] Further, neither of these allegations pointed to a systematically deficient practice. The court concluded that the commonality requirement was not met.

The court noted that it "could end its inquiry here" because its Rule 23(a)(2) analysis required that both classes be decertified.[26] It nevertheless went on to address, for the sake of completeness, the Rule 23(b) requirements for each class. After observing that there was no longer a single identifiable remedy that could help all class members, the court granted the defendant's motion to decertify the Rule 23(b)(2) class. The court then discussed whether a class could be certified under Rule 23(b)(3). The court concluded that the Rule 23(b)(3) class could be modified to encompass only those detainees whose claims arose when the Jail had only one dentist, because their claims presented a common question of deliberate indifference. This class's claims are still pending in the district court.

Finally, the court explained that, because it decertified the Rule 23(b)(2) class, the motion for a permanent injunction was moot. In other words, without a certifiable class, the court saw no need to consider the underlying merits of the petitioners' claims. The detainees timely appealed the court's order.

---

[25] *Id.* at 17.

[26] *Id.* at 18.

**B.**

The district court's foundational reason for decertifying both classes was that the bench trial had established that the detainees had not presented "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). We review a district court's decision regarding class certification for abuse of discretion. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 755 (7th Cir. 2014). Of course, "legal determinations made in support of the decision are reviewed de novo." *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 490 (7th Cir. 2012).

**1.**

When determining whether to certify a class, a district court first must find that the requirements of Federal Rule of Civil Procedure 23(a) are met:

> (1) the class is so numerous that joinder of all members is impracticable (numerosity);
>
> (2) there are questions of law or fact common to the class (commonality);
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and
>
> (4) the representative parties will fairly and adequately protect the interests of the class (adequacy of representation).

Fed. R. Civ. P. 23(a) (parentheticals added). Here, the district court's focus, and therefore our concern, is the commonality

requirement: whether "there are questions of law or fact common to the class." *Id.*

The Supreme Court recently clarified the contours of this commonality requirement. In *Wal-Mart Stores, Inc. v. Dukes*, current and former employees alleged, on behalf of 1.5 million members of a class, that the company had denied them equal pay or promotions on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 et seq. 564 U.S. at 344–45. The employees did not contend that Wal-Mart had an express corporate policy of sex discrimination. Instead, they contended that Wal-Mart provided local managers with undue discretion over pay and promotion, which resulted in an unlawful disparate impact on female employees. *Id.* In their view, Wal-Mart was liable for these decisions because of "its refusal to cabin its managers' authority" and its "strong and uniform 'corporate culture'" that "permit[ted] bias." *Id.* at 345.

The Court determined that the employees' claims lacked commonality and therefore decertified the class. The Court began by observing that "[a]ny competently crafted class complaint literally raises common 'questions.'" *Id.* at 349 (alteration in original) (internal quotation marks omitted). To demonstrate commonality for the purposes of Rule 23(a)(2), however, a prospective class must show that its claims "depend upon a common contention … of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. The Court noted that this analysis may "entail some overlap with the merits of the plaintiff's underlying claim." *Id.* at

351. Further, courts are not simply applying a pleading standard; instead a prospective class "must be prepared to prove that there are *in fact* … common questions of law or fact." *Id.* at 350 (emphasis in original). However, the Court made clear that "even a single common question will do." *Id.* at 359 (alterations omitted) (internal quotation marks omitted).

Applying this standard to the employees' claims, the Court held that the employees had failed to identify a class-wide policy or practice which applied to all of the class members. The employees objected to the company's grant of discretion to employers, but they had "not identified a common mode of exercising discretion that pervades the entire company." *Id.* at 356. The employees also alleged that a corporate culture existed, but they had failed to present evidence that demonstrated that such a culture would be provable at trial or that this culture caused the alleged disparity. *Id.* at 353–55. The Court concluded that the employees "wish[ed] to sue about literally millions of employment decisions at once. Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer." *Id.* at 352 (emphasis omitted).

In the wake of *Wal-Mart*, we have made clear that a prospective class must articulate at least one common question that will actually advance all of the class members' claims. For instance, when students brought a class action against a public school district, alleging that the district delayed or denied entry into individualized education programs ("IEPs") in violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1440 et. seq., we held that the students had not identified a common question:

> To illustrate the commonality problem in the
> certified class, consider two hypothetical stu-
> dents within the class: one has a disability and
> would be eligible for special education but has
> never been identified as being disabled nor
> gone through the IEP process; another was
> identified as disabled and received a timely IEP
> meeting, but the child's parents did not attend
> the IEP meeting and were not notified of their
> right to do so. Both scenarios involve violations
> of the IDEA, but what common question can be
> answered that would assist the court in deter-
> mining [the district's] liability for each? On the
> plaintiffs' theory, that question is something
> like this: Did [the district] fulfill its IDEA obli-
> gations to each child? But while that generic
> question is surely a part of both children's
> claims, it must be answered separately for each
> child based on individualized questions of fact
> and law, and the answers are unique to each
> child's particular situation.

*Jamie S.*, 668 F.3d at 498; *see also Suchanek*, 764 F.3d at 756
("Where the defendant's alleged injurious conduct differs
from plaintiff to plaintiff, … no common answers are likely to
be found."). We noted that "an illegal policy might provide
the 'glue' necessary to litigate otherwise highly individual-
ized claims as a class," but that the plaintiffs had not pre-
sented any proof of such a policy. *Jamie S.*, 668 F.3d at 498 (em-
phasis omitted) (quoting *Wal-Mart*, 564 U.S. at 352); *see also*
*Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 898 (7th Cir. 2012)
(affirming the decertification of a class where the plaintiffs

challenged a series of individual employers' decisions but failed to identify a company-wide policy).

By contrast, we have held that consumers who brought claims of fraudulent representation against a seller of pharmaceuticals presented a common question concerning whether the seller had made fraudulent statements that a drug had been "'clinically tested' and 'scientifically formulated.'" *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 673 (7th Cir. 2015). The seller contended that the consumers were arguing that the drug was "ineffective" and that this argument would "depend[] on individual factors such as the severity of the consumer's pre-use medical condition, the consumer's pattern of use, and other potentially confounding variables." *Id.* We rejected the seller's characterization of the plaintiffs' claims, explaining that their "claims do not rise or fall on whether individual consumers received health benefits" but rather "whether [the seller's] representations were deceptive." *Id.* That latter question, we held, could be answered in one stroke. *Id.*; *see also Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 374–75 (7th Cir. 2015) (finding a common question where a group of employees alleged that their employer had an "unofficial policy" of requiring unpaid overtime hours and submitted affidavits from a branch manager and regional manager alluding to such a policy); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 798 (7th Cir. 2013) (finding that one class of consumers presented a common question whether a washer design caused mold to accumulate and that another class presented a common question whether a washer control unit caused the machine to shut down).

We also have emphasized that the common question presented by a prospective class of plaintiffs need not resolve

every issue in the case. *See Suchanek*, 764 F.3d at 756 ("Neither Rule 23 nor any gloss that decided cases have added to it requires that *every* question be common. It is routine in class actions to have a final phase in which individualized proof be submitted." (emphasis in original)). In *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012), for example, we found a common question where employers had brought a classwide challenge to two employment policies that potentially had a discriminatory impact. *Id.* at 488–89. We observed that "should the claim of disparate impact prevail in the class-wide proceeding, hundreds of separate trials may be necessary to determine which class members were actually adversely affected … . But at least it wouldn't be necessary in each of those trials to determine whether the challenged practices were unlawful." *Id.* at 491.

Similarly, in *Chicago Teachers Union, Local No. 1 v. Board of Education of Chicago*, 797 F.3d 426 (7th Cir. 2012), we considered whether educators could bring a classwide challenge, on the basis of race-based discrimination, to a three-step review process that identified "deficient" schools and then replaced the faculty and staff from those schools. *Id.* at 429–31. The first two steps in this process were objective and general, but the third step arguably was individualized to each school. *Id.* at 435. We held that "if the plaintiffs allege that the objective criteria in the first two steps narrowed the pool in such a way as to have a disparate impact on African-American teachers (and indeed they do), then this is the glue that binds the claims together without regard to the later, subjective step." *Id.* at 436. In other words, a court could determine whether the first two steps in the process were discriminatory on a classwide basis, even if a challenge to the last step in the process could not be

adjudicated classwide.[27] In all of these cases, however, the answer to a common question of law or fact resolved a key element of all of the plaintiffs' claims.

Our sister circuits have similarly required plaintiffs to articulate at least one common question that is central to the resolution of all of their claims. *See, e.g.*, *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 84 (2d Cir. 2015) ("Consideration of [the commonality] requirement obligates a district court to determine whether plaintiffs have suffered the same injury." (internal quotation marks omitted)); *DL v. Dist. of Columbia*, 713 F.3d 120, 126–27 (D.C. Cir. 2013) (collecting cases and noting that, "[i]n the absence of identification of a policy or practice that affects all members of the class in the manner *Wal-Mart* requires, [a] district court's analysis is not faithful to the Court's interpretation of Rule 23(a) commonality"); *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 843 (5th Cir. 2012) ("*Wal-Mart* requires district courts to specifically delineate how a class proceeding would allow the court to resolve a discrete question of law whose determination 'will resolve an issue that is central to the validity of each of the [individual plaintiff's] claims in one stroke.'" (quoting 564 U.S. at 350)).

---

[27] We went on to hold, however, that the third step in the process *did* present a common question of fact or law. Even though that step was individualized to each school, determinations were still being made by "one decision-making body, exercising discretion as one unit." *Chi. Teachers Union*, 797 F.3d at 440. We contrasted the educators' challenge to the challenges against the decisions of the board with the challenges against the decisions of "thousands of individual managers" in *Wal-Mart* and the decisions of "countless school district employees" in *Jamie S. Id.* at 439.

A determination of commonality often requires a precise understanding of the nature of the plaintiffs' claims. In *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014), a case arising in a context not too different from the one here, our colleagues on the Ninth Circuit considered whether prison inmates could bring a series of Eighth Amendment challenges on a class-wide basis. The court noted that "commonality cannot be determined without a precise understanding of the nature of the underlying claims" presented by the plaintiffs. *Id.* at 676. Upon analyzing the claims, the court concluded that "class members are as one in their exposure to a particular and sufficiently well-defined set of allegedly illegal policies and practices, rather than only in their advancement of a general Eighth Amendment legal theory." *Id.* at 679. The court noted, for example, the plaintiffs' allegations that the prison severely understaffed medical facilities and had a practice of placing inmates in isolation with insufficient nutrition. *Id.* at 679–80. The court emphasized that the plaintiffs had provided *actual proof* of these illegal policies and practices, as opposed to "utterly threadbare allegations." *Id.* at 683. For these reasons, the court found common questions.

The governing principle at the heart of our inquiry is therefore well-established and regularly applied: a common question "must be of such a nature that it is capable of class-wide resolution" in order to satisfy the requirements of Rule 23(a)(2). *Wal-Mart*, 564 U.S. at 350. "The critical point is 'the need for *conduct* common to members of the class.'" *Suchanek*, 764 F.3d at 756 (emphasis in original) (quoting *In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014)). The common question (or common questions) need not address every aspect of the plaintiffs' claims, but it must "drive

the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (internal quotation marks omitted); *see also Chi. Teachers Union*, 797 F.3d at 434. It must "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.

### 2.

Here, the detainees contend that the district court misread *Wal-Mart* and its progeny. In their view, the district court demanded that the detainees present a *single* common question rather than allowing for multiple common questions. In other words, the detainees argue that the district court imposed a "ceiling" of a single common question when it should have imposed a "floor."[28]

Had the district court imposed a cap on the number of common questions, as the detainees suggest, its decision could not be justified by the teaching of *Wal-Mart. Cf. In re IKO*, 757 F.3d at 603 (finding commonality where plaintiffs presented four common questions); *Parsons*, 754 F.3d at 664, 679 (identifying ten practices or policies that each represented a common question). We think it clear, however, that the detainees' characterization of the district court's ruling is without any foundation. Rather, after noting the Rule's requirement that the district court consider whether the detainees had presented "*questions* of law or fact common to the class,"[29]

---

[28] Appellants' Br. 17.

[29] R.390 at 14 (emphasis added) (quoting Fed. R. Civ. P. 23(a)(2)).

the court concluded that "there is no longer a single question the answer to which would resolve a significant issue in the case."[30] This statement hardly means that the district court decertified the class because the detainees presented too many common questions; the court decertified the class because the detainees had not presented *even one* question that could "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. The district court correctly understood the holding of *Wal-Mart*.

### 3.

The detainees further maintain that the district court abused its discretion by concluding that the detainees had not presented *any* common questions of fact or law for the purposes of Rule 23(a)(2). As the Supreme Court noted, analysis of this question will "entail some overlap with the merits of the plaintiff's underlying claim" of deliberate indifference. *Wal-Mart*, 564 U.S. at 351; *see also Parsons*, 754 F.3d at 676. We therefore pause to set forth the standards for deliberate indifference claims under the Eighth and Fourteenth Amendments.[31]

---

[30] *Id.* at 17.

[31] "The Eighth Amendment's ban on 'cruel and unusual punishments' requires prison officials to take reasonable measures to guarantee the safety of inmates, including the provision of adequate medical care." *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010). We note that some members of the class are pretrial detainees and that "the Eighth Amendment applies only to convicted persons." *Id.* at 831. However, in this context, the present

"Deliberate indifference occurs when a defendant realizes that a substantial risk of serious harm to the prisoner exists, but" intentionally or recklessly "disregards that risk." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976). We have identified "two distinct categories of deliberate indifference claims" pertaining to medical treatment. *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430 (7th Cir. 1989). First, there are "claims of isolated instances of indifference to a particular inmate's medical needs." *Id.*; *see also Berry*, 604 F.3d at 440. For these claims, a plaintiff must show that he suffered from an objectively serious medical condition[32] and that the defendant was deliberately indifferent to that condition. *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015); *see also Arnett v. Webster*, 658 F.3d 742, 750–51 (7th Cir. 2011). Second, there are "claims that systemic deficiencies at the prison's health care facility rendered the medical treatment constitutionally inadequate for all inmates." *Cleveland-Perdue*, 881 F.2d at 430–31. For these claims, plaintiffs must demonstrate that "there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Wellman v. Faulkner*, 715 F.2d 269,

---

case law holds that "pretrial detainees … are entitled to the same basic protections under the Fourteenth Amendment's due process clause. Accordingly, we apply the same legal standards to deliberate indifference claims brought under either the Eighth or Fourteenth Amendment." *Id.*; *see also Smentek*, 683 F.3d at 374. *But see Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015) (holding that there are different standards for sentenced prisoners and pretrial detainees in the case of excessive force claims).

[32] We have held that tooth decay and similarly severe dental pain "can constitute an objectively serious medical condition." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

272 (7th Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

After hearing the evidence at trial, the district court took the view that the detainees' claims were best characterized as "claims of isolated instances of indifference to a particular inmate's medical needs." *Cleveland-Perdue*, 881 F.2d at 430. There certainly is a substantial basis for such a determination. Some of the detainees contend that they did not receive a prompt response to their HSR but otherwise received timely and responsive treatment. Others contend that they received an evaluation within a day of submitting their HSR but they then experienced a significant delay before a return appointment. Still others allege that they saw a dentist and were prescribed medicine but did not receive the prescribed medicine. Just like the students in *Jamie S.*, each of whom encountered unique difficulties caused by different actors as they underwent the IEP process in their schools, there is no common question here that addresses all of these detainees' claims at once. *See* 668 F.3d at 498. The detainees each present a different situation that involved a different type of dental pain, took place at a different time, involved different medical professionals and prison staff, and concerned a different alleged deficiency in the treatment process. *Cf. Chi. Teachers Union*, 797 F.3d at 439–40 (finding commonality where a single decision-making body enforced a general, albeit discretionary, policy).

The detainees nevertheless ask us to focus especially on two questions of fact that they believe to be "common" among all their claims of deliberate indifference:

> (1) Does the Jail's continuing failure to require a face-to-face evaluation from a

> > registered nurse within 24 hours of a
> > written complaint of dental pain result in
> > gratuitous pain?
>
> (2)    Does the failure of the Jail to provide
>        timely "return to clinic" appointments
>        result in preventable and gratuitous
>        pain?[33]

Both of these questions concern delays, albeit different sorts of delays, in medical treatment. We previously have held that when assessing deliberate indifference claims, a delay in medical treatment "is not a factor that is either always, or never, significant. Instead, the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010); *see also Kress v. CCA of Tenn., LLC*, 694 F.3d 890, 893 (7th Cir. 2012) (approving a district court's observation that "the level of medical care required … will vary depending on each inmate's circumstances"). The more significant the dental pain, the more immediate is the need for treatment. In determining whether such complaints can be characterized appropriately as presenting a common question susceptible to class resolution, careful examination of the context is crucial.

One of our earlier cases illustrates this point. In *Harper v. Sheriff of Cook County*, 581 F.3d 511 (7th Cir. 2009), we had to consider whether a class bringing Fourth Amendment claims presented common questions about the length of detention.

---

[33] Appellants' Br. 23; *see also* R.390 at 17 (district court identifying these two proposed common questions).

*Id.* at 515. We explained that the "constitutionality of [any] detention depends on whether the length of the delay … was reasonable in any given case." *Id.* As a result, "[l]iability, to say nothing of damages, would need to be determined on an individual basis." *Id.; see also Portis v. City of Chicago, Ill.*, 613 F.3d 702, 705 (7th Cir. 2010) ("Because reasonableness is a standard rather than a rule, and because one detainee's circumstances differ from another's, … class certification is inappropriate.").[34] In the same way, the constitutionality of a wait for medical treatment will depend on a variety of individual circumstances. *See McGowan*, 612 F.3d at 640. These questions can only be answered by looking at the unique facts of each detainee's case. In light of their contextual nature, the district court did not abuse its discretion in concluding that the questions the detainees present about the length of delay in medical treatment are incapable of being solved on a class-wide basis. *See Wal-Mart*, 564 U.S. at 350.

A consideration of each of the detainees' proposed questions makes clear the hurdle that cannot be overcome. First, the detainees claim that the Jail fails to provide a face-to-face evaluation from a registered nurse within twenty-four hours of a complaint. However, simply establishing that detainees at the Jail consistently wait more than twenty-four hours does not advance materially any individual's claim of deliberate

---

[34] Both *Harper v. Sheriff of Cook Cty.*, 581 F.3d 511, 515 (7th Cir. 2009), and *Portis v. City of Chicago, Ill.*, 613 F.3d 702, 704 (7th Cir. 2010) concerned whether common issues predominated under Rule 23(b)(3), and not whether the class had failed to present a single common issue under Rule 23(a)(2). However, both cases made clear that a question about the length of detention could not be common to the class.

indifference.[35] *See Wal-Mart*, 564 U.S. at 350 (asking whether the question "drive[s] the resolution of the litigation" (internal quotation marks omitted)). Again, an earlier Fourth Amendment case illustrates the point well. When plaintiffs brought a class action challenging any detention following a custodial arrest that lasted more than two hours, we held that the class should be decertified. *Portis*, 613 F.3d at 703–04. We explained that, "[g]iven the contextual nature of analysis under the fourth amendment," imposing "an inflexible two-hour rule" would be "impossible." *Id.* at 704. Just as a rigid two-hour rule could not be imposed under the Fourth Amendment, a rigid twenty-four-hour rule for dental care cannot be imposed under the Eighth Amendment. In both areas of law, the analysis is similarly contextual.

The detainees also claim that the question whether the Jail provides timely "return to clinic" appointments is common to the class. However, to determine whether a return visit is "timely," a court must look at evidence that will be unique to each individual class member. *See McGowan*, 612 F.3d at 640. As the district court correctly perceived, the differing testimonies at the bench trial show that this inquiry would be particularly individualized in this case. John Saiger did not receive a return appointment to extract his broken wisdom tooth until

---

[35] Indeed, the evidence suggests that the wait time before a face-to-face evaluation varied. Quentin Scott testified that he saw a physician's assistant, who was able to provide aspirin and ibuprofen, on the same day he submitted an HSR. Orlando Allen similarly testified that he received an evaluation from a registered nurse within twenty-four hours of submitting an HSR in October 2013. However, he also testified that he submitted two or three other HSRs earlier that year without receiving *any* evaluation.

five months after his first appointment. Alternatively, Orlando Allen received a return appointment within a few days of his first appointment. Stanford Thompson similarly testified that his return appointment occurred a week after initially seeing a dentist for tooth pain. Any or all of these individuals may have experienced deliberate indifference. *See Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) ("Even a few days' delay in addressing a severely painful but readily treatable condition suffices to state a claim of deliberate indifference."). However, the detainees do not explain how the court can define a "timely" return visit without looking at the circumstances of each individual case. The district court reasonably concluded that it could not resolve a question about "timely visits" in a classwide manner.

As noted earlier, we also recognize a second category of deliberate indifference claims alleging "that systemic deficiencies at the prison's health care facility rendered the medical treatment constitutionally inadequate for all inmates." *Cleveland-Perdue*, 881 F.2d at 430–31. In *Wellman v. Faulkner*, 715 F.2d 269 (7th Cir. 1983), for example, we found systemic deficiencies at a prison where two out of three physicians could not communicate effectively with patients because of a language barrier, a staff psychiatrist position had been unfilled for two years, prisoners had been denied vital surgeries for two to five years, and medical supplies were being reused because they had not been restocked. *Id.* at 272–74. Similarly, in *Cleveland-Perdue v. Brutsche*, we held that a plaintiff stated a claim of systemic deliberate indifference where a prison allegedly had failed to make any changes to its procedures following the death of an inmate who had been prescribed medicine over the phone. 881 F.2d at 428–31. In contrast, the plaintiff in *Holmes v. Sheahan*, 930 F.2d 1196 (7th Cir. 1991), who

only presented evidence about the medical care he himself received, did not provide evidence of a widespread practice, and therefore failed to present a claim of systemic deliberate indifference. *Id.* at 1202 n.4; *see also Gutierrez v. Peters*, 111 F.3d 1364, 1375 n.10 (7th Cir. 1997) (determining that, "in light of [a plaintiff's] overall treatment, the few incidents in which [the plaintiff] suffered delays in his treatment simply fail to reveal a 'pattern of conduct' evidencing deliberate indifference" as articulated in *Wellman*).

If plaintiffs can present classwide evidence that a prison is engaging in a policy or practice which rises to the level of a systemic indifference, then we can identify "conduct common to members of the class" which advances the litigation. *Suchanek*, 764 F.3d at 756 (emphasis omitted) (internal quotation marks omitted); *see also Jamie S.*, 668 F.3d at 498 ("[A]n illegal policy might provide the 'glue' necessary to litigate otherwise highly individualized claims as a class." (emphasis omitted)). Indeed, the Ninth Circuit in *Parsons* identified as a common question whether there was a systemic "failure to provide timely access to medically necessary specialty care." 754 F.3d at 664, 679 (internal quotation marks omitted). The court explained that where "variations undoubtedly exist" between each inmate's treatment, the claim must be that a prison "regularly provides a level of [care] that is so inadequate that it exposes *any* inmate … to a substantial risk of serious harm." *Id.* at 680 (emphasis in original). Further, the court did "not hold that utterly threadbare allegations that a group is exposed to illegal policies and practices are enough to confer commonality." *Id.* at 683.

As *Parsons* suggests, a class action probably could be brought where plaintiffs presented some evidence that a

prison had a policy that regularly and systemically impeded timely examinations. *See Portis*, 613 F.3d at 705 (discussing the potential for common issues where "the class sought to establish that a jurisdiction had adopted a policy of deliberate delay"). Similarly, a class action probably could be brought where evidence suggested that a prison had such a consistent pattern of egregious delays in medical treatment that a trier of fact might infer a systemic unconstitutional practice. *See Holmes*, 930 F.2d at 1202 n.4 (discussing how a pattern of unconstitutional conduct can indicate "an entrenched practice that has the effective force of a formal policy").

Here, however, the district court correctly observed that the detainees' "questions do not point to the type of 'systematic and gross deficienc[y]' … that would lead to a finding that all detainees are effectively denied treatment."[36] A twenty-four hour delay in responding to treatment does not automatically constitute deliberate indifference in violation of the Eighth and Fourteenth Amendments, and the detainees do not allege that the Jail has a specific policy that directly causes a wait following an HSR. Some of the alleged delays in return to clinic appointments "may constitute deliberate indifference depending on the facts of the individual case,"[37] but the detainees do not present a pattern of egregious delays across the entire class. *See Gutierrez*, 111 F.3d at 1375 n.10.[38] Just as in

---

[36] R.390 at 17 (quoting *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983)).

[37] *Id.*

[38] The detainees suggest that any delays in return appointments are the result of one policy: Cermak's decision to vest a scheduling department

*Wal-Mart*, proof of a systemic practice which could tie all the claims together is "absent here." 564 U.S. at 353; *see also Jamie S.*, 668 F.3d at 498 (vacating a class-certification order because there was no evidence of a common illegal policy); *Bell*, 800 F.3d at 375 (holding that a prospective class had presented a common issue of fact when it "offered evidence" of "a broader company policy"). For these reasons, the detainees' proposed questions do not address a gross and systemic deficiency that applies to the entire class. Instead, the detainees bring a series of individual claims of deliberate indifference. *See Cleveland-Perdue*, 881 F.2d at 430.

The detainees still have, of course, legal avenues in which to bring their claims of deliberate indifference. First, the district court did identify one common policy that might constitute systemic deliberate indifference: Cook County's decision

---

with the primary authority to schedule appointments rather than the dentists themselves. However, that policy is not central to the claims of detainees who did not experience a delay in return appointments and allege that their treatment was deficient for other reasons. More importantly, the detainees do not explain why a clerk in the scheduling department would cause longer waits between appointments than a dentist, much less how the decision to vest authority in a clerk was so misguided that it constitutes deliberate indifference in violation of the Constitution. In fact, a dentist who disliked the policy testified at the bench trial that "it runs more efficient if scheduling does the appointments. It has us more—doing more—having more time to do procedures than scheduling patients." R.453 at 83. The detainees have not invited our attention to any evidence which could prove that this policy is the cause of a delay in treatment. *See Wal-Mart*, 564 U.S. at 353–55 (refusing to grant class certification on the basis of a "strong corporate culture" because the plaintiffs failed to present any proof that adverse employment actions resulted from this corporate culture).

to staff the Jail with only one dentist.[39] That policy ended at some time before the district court issued its order, so the court certified a narrower class of detainees who received inadequate dental care *before* the Jail hired more dentists. That action is ongoing. Further, detainees may bring individual claims of deliberate indifference based on their own unique circumstances. We express no opinion on the potential merits of the pending class action or on any individual detainee's claims. Rather, we simply hold that the district court did not abuse its discretion when it concluded, on the record before it, that the detainees' claims do not present common issues of law or fact. We therefore affirm the district court's decision to decertify the class.

## II

While the appeal from the decertification of the classes and the consequent denial of request for injunctive relief was pending in this court, the detainees filed a motion in the district court requesting relief under Federal Rule of Civil Procedure 60(b). They maintained that new evidence established that there were common questions of law and fact and that class certification was possible. Invoking our Seventh Circuit Rule 57, the detainees asked that the district court indicate whether, on the basis of this information, it would be inclined to grant relief if we were to vacate the extant orders and re-

---

[39] The Ninth Circuit has recognized that "a policy and practice of severe under-staffing" presents a common question that can be addressed on a classwide basis. *Parsons v. Ryan*, 754 F.3d 657, 679 (9th Cir. 2014).

mand the case for further proceedings. The district court denied the motion, stating that it was not inclined to revise its order decertifying the class. The detainees now appeal the denial of their Rule 60(b) motion.

The detainees brought this matter to the district court's attention through a motion under Federal Rule of Civil Procedure 60(b). That rule is, "by its terms[,] limited to 'final' judgments or orders" and is "inapplicable to interlocutory orders." *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571 (7th Cir. 2006); *see also Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015); *Adams v. City of Chicago*, 135 F.3d 1150, 1153 (7th Cir. 1998). Here, because the district court had not entered a final judgment, the detainees' filing was simply a request for relief from an interlocutory order decertifying a class. *See Mullins*, 795 F.3d at 657 (describing an order granting or denying certification as interlocutory). The detainees therefore were not permitted to file a Rule 60(b) motion.

That said, the detainees, although unable to employ Rule 60(b) as a vehicle, were not altogether barred from presenting new evidence to the district court on the certification question in what amounted to a motion to reconsider the decertification of the class, *see Gary v. Sheahan*, 188 F.3d 891, 893 (7th Cir. 1999), or an amended motion to certify the class, *see McReynolds*, 672 F.3d at 486; Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). For a period of time, there appeared to be significant tension in our case law as to when the disposition of such a motion is appealable to this court. *Gary* placed severe restrictions on such an appeal, permitting one only if the district court "materially alters the [original] decision."

188 F.3d at 893. *McReynolds* viewed the matter quite differently and saw this court as having far more flexibility in determining whether an appeal ought to be taken. 672 F.3d at 486–87. It suggested that an appeal ought to be permitted whenever, "as a result of new law or newly learned facts, the [initial] denial of certification was erroneous." *Id.* at 486. This standard, the court said, is necessary to permit the parties to avoid endless years of unnecessary litigation and to put the case on a path to speedy resolution. *Id.* It appears that this tension has been assuaged substantially and in all likelihood eliminated by our most recent decisions in *Driver v. AppleIllinois, LLC*, 739 F.3d 1073, 1076 (7th Cir. 2014) and *Matz v. Household International Tax Reduction Investment Plan*, 687 F.3d 824 (7th Cir. 2012). It is clear now that, in concert with our sister circuits, we will allow an appeal only when the district court has issued an order "materially altering a previous order granting or denying class certification … even if it doesn't alter the previous order to the extent of changing a grant into a denial or a denial into a grant." *Matz*, 687 F.3d. at 826.

In this case, allowing appellate consideration of the matters raised in the detainees' motion filed under Rule 60(b) would not foster, but would work to the detriment of, the policy concerns that we have articulated in our cases.[40] Here, the

---

[40] We previously have construed Rule 60(b) orders as reconsiderations of interlocutory orders and allowed for appellate consideration. For example, we construed a district court's denial of a Rule 60(b) motion after a grant of summary judgment as a reconsideration of the prior summary judgment ruling. *Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015). Similarly, we construed a district court's order stating, pursuant to Circuit

district court made no ruling that altered, in any meaningful sense, its earlier decision. Indeed, the court pointedly said that, until we ruled on its earlier decision, any definitive decision on the matters raised in the subsequent motion would be premature. Moreover, the court noted that the detainees' own approach to discovery might supply a basis for its decision whether to reconsider the decertification.[41]

---

Rule 57, that it was disinclined to change its ruling denying injunctive relief, as "the equivalent of the initiation of a new motion for preliminary injunction." *Adams v. City of Chicago*, 135 F.3d 1150, 1154 (7th Cir. 1998).

In those cases, however, unique circumstances compelled us to construe the orders in this manner. In *Adams*, the plaintiffs filed a Rule 60(b) motion after we directed them to follow the procedure laid out in Circuit Rule 57. 135 F.3d at 1153–54. We noted that "we share[d] the responsibility for any confusion resulting from this patchwork process" and declared that "[h]enceforth, the Circuit Rule 57 procedure should be used exclusively for final judgments." *Id.* at 1154. In *Mintz*, we made an exception where "despite denying what it erroneously treated as a Rule 60(b) motion," the district court "did review the belated submission and decided that it would not affect the grant of summary judgment." 788 F.3d at 679. In other words, the district court's analysis of the Rule 60(b) motion was indistinguishable from an analysis of a summary judgment motion. The order could fairly be construed as one concerning summary judgment without any change in the analysis. In this case, however, the district court engaged in a different review than the one we will consider.

[41] *See* R.427 at 10 ("Now, a lot of the discovery problems were of your own making. … So my view is let's have the Court of Appeals take a look at this case and see what they say. … I'm not—certainly not inclined to tell the Court of Appeals that I'm inclined to vacate what I've done before."). In their brief in this court, the detainees also argue that there was an impermissible "asymmetry" to the discovery allowed each party. This argument is presented to give context to the detainees' arguments on the sub-

**Conclusion**

The district court did not abuse its discretion when it determined that the evidence produced at trial required, in accordance with the Supreme Court's holding in *Wal-Mart*, the decertification of the classes that it had certified previously. Accordingly, the district court's judgment in Case Number 14-3753 is AFFIRMED. Further, for the reasons stated above, the appeal in Case Number 15-1616 is DISMISSED. The defendants may recover their costs in this court.

---

stantive merits of its Rule 60(b) motion. For the reasons we have explained, any consideration of these matters on appeal would be, at best, premature.